1

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                          FORT WORTH DIVISION

 3    UNITED STATES OF AMERICA        .  CRIMINAL ACTION NO.
                                      .  4:17-CR-058-Y-1
 4    V.                              .
                                      .  Fort Worth, Texas
 5    JORDAN LEE BELL                 .  November 14, 2017
      . . . . . . . . . . . . . . . . .

 6

 7

 8

 9                      TRANSCRIPT OF PROCEEDINGS
                           (Sentencing Hearing)
                   BEFORE THE HONORABLE TERRY R. MEANS
10                    UNITED STATES DISTRICT JUDGE

11

12

13    APPEARANCES:

14    For the Government:           MS. MEGAN J. FAHEY
                                    United States Attorney's Office
15                                  801 Cherry Street, Suite 1700
                                    Fort Worth, Texas  76102-6897
16                                  (817) 252-5200

17    For the Defendant:           MR. MICHAEL C. LOWE
                                    Law Office of Michael C. Lowe
18                                  Plaza of the Americas, N. Tower
                                    700 N. Pearl Street, Suite 2170
19                                  Dallas, Texas  75201
                                    (214) 526-1900
20
      Court Reporter:              MS. ANA P. WARREN
21                                  U.S. District Court Reporter
                                    501 W. 10th Street, Room 502
22                                  Fort Worth, Texas  76102-3637
                                    (817) 850-6681
23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription.
```

2

*P R O C E E D I N G S*

1

2      (Commencing, 10:05 a.m.)

3          THE COURT:  We have a sentencing docket this morning

4      as well.  We'll begin with the sentencing of Jordan Lee Bell,

5      Case Number 4:17-CR-058-Y, United States of America versus

6      Jordan Lee Bell.

7          Are the parties ready to proceed?

8              MR. LOWE:  Ready, Your Honor.

9              MS. FAHEY:  Yes, Your Honor, Megan Fahey for the

10     United States.

11             THE COURT:  Could the attorneys approach just

12     briefly?

13         (Off-the-record discussion at the bench at this time)

14             THE COURT:  Mr. Bell, please acknowledge your

15     presence in court for the record by stating your full name?

16             DEFENDANT BELL:  Jordan Lee Bell.

17             THE COURT:  Mr. Bell, you appeared before Magistrate

18     Judge Jeffrey Cureton on June 14, 2017, at which time you

19     entered a plea of guilty to Count 1 of the indictment charging

20     you with possession of a visual depiction of a minor engaged

21     in sexually explicit conduct, in violation of 18, United

22     States Code, Section 2252(a)(4)(B), and a plea of true to the

23     forfeiture notice pursuant to 18, United States Code, Section

24     2253.

25         On that date, Judge Cureton found that your plea of guilty

1  was a knowing and voluntary plea supported by an independent

2  basis in fact containing each of the essential elements of the

3  offense.  You told him at that time that you understood the

4  elements of the offense, agreed to the accuracy of the factual

5  resume, and admitted that you committed all essential elements

6  of the offense.  Accordingly, on June 29, 2017, I entered an

7  order accepting your plea and adjudging you guilty of the

8  crime alleged in the indictment against you.

9      This plea of guilty was taken pursuant to a plea

10  agreement.  The Court is inclined to reject the plea agreement

11  but before finally deciding to do so will now give the parties

12  the opportunity to convince the Court that the agreed sentence

13  departs from the guideline range for justifiable reason.

14      Let's begin with the government, Ms. Fahey.  You may

15  proceed.

16          MS. FAHEY:  Yes, Your Honor.

17      We have no evidence to offer.  Just as way of an

18  explanation, the reason we believe this is an appropriate

19  sentence, we anticipated the guideline range to be about six

20  to eight years and discounted that based on his age.  The plea

21  agreement is solely a reflection of the fact that the

22  defendant is 18 years old and didn't finish his senior year in

23  high school because he was in federal custody.

24          THE COURT:  Okay.  So you were anticipating an

25  imprisonment range under the guidelines of substantially less

4

1   than what it turned out to be?

2        MS. FAHEY:  Yes, Your Honor.  We weren't anticipating

3   all of the enhancements, mainly, the additional five points

4   for receiving valuable consideration in exchange for the --

5        THE COURT:  All right.  And, Mr. Love, you may now

6   proceed -- Lowe, pardon me.  Mr. Lowe, you may now proceed.

7        MR. LOWE:  I call Dr. Lewis, Frank Lewis.

8        THE COURT:  All right.

9     Good morning, sir.

10        THE WITNESS:  Good morning, Judge.

11        THE COURT:  Please raise your right hand and be

12   sworn.

13     (Witness sworn by the Court)

14        THE COURT:  Please be seated, sir.

15     You may proceed.

16        MR. LOWE:  Thank you, Judge.

17    FRANKLIN D. LEWIS, Ph.D, testified under oath as follows:

18                      **DIRECT EXAMINATION**

19   BY MR. LOWE:

20   Q.  Could you please state your name?

21   A.  Franklin D. Lewis, Ph.D.

22   Q.  Dr. Lewis, what do you do for a living?

23   A.  I'm a clinical and forensic psychologist in Dallas.

24   Q.  All right.  And do you have any area of specialization

25   that you work in?

5

1   A.  Yes, I do.  I work in the area of sex offenses.  I work

2   with both adolescents and adults.

3   Q.  How long have you been doing that?

4   A.  I've been doing this for about 40 years.  I also was the

5   chief psychologist for the Dallas County Jail for 17 years.

6           MR. LOWE:  Judge, can I approach the witness?

7           THE COURT:  Yes.

8   BY MR. LOWE:

9   Q.  I'm showing you what's been marked as Defendant's Exhibit

10  Number 1.  I have previously shown a copy of this to the

11  United States Attorney in the case.

12      Is that a fair and accurate representation of your

13  educational background?

14  A.  It is.

15          MR. LOWE:  I offer Defendant's Number 1.

16          THE COURT:  Is there objection?

17          MS. FAHEY:  No, Your Honor.

18          THE COURT:  It's a vitae?

19          MR. LOWE:  Yes, Judge.

20          THE COURT:  Thank you, sir.

21          MR. LOWE:  Thank you.

22  BY MR. LOWE:

23  Q.  Dr. Lewis, can you please describe for the judge the types

24  of people that you're supervising currently in treatment, the

25  types of offenses they have committed?

1  A.  Yes.  They range all the way from online solicitation of a

2  minor to public lewdness, DWI.  Mainly, they come out of the

3  courts, referrals by the courts.

4  Q.  So are you in contact with probation departments and

5  courts on a regular basis?

6  A.  Yes.  I work with the probation departments in both Dallas

7  and Tarrant County and parole.

8  Q.  Okay.  So you have also supervised folks who have been

9  sentenced to the penitentiary and then come out on parole?

10  A.  Yes.

11  Q.  In the federal system, it's called supervised release, but

12  it's a similar type of supervision.

13      Did you meet with Jordan Bell at any point?

14  A.  I did.

15  Q.  How many times did you meet with Jordan Bell?

16  A.  I met with him seven or eight times in February, March of

17  2017.

18  Q.  So that's prior to him being arrested in this case?

19  A.  Correct.

20  Q.  What did you do with Jordan Bell when you met with him the

21  first time?

22  A.  Well, when I met him the first time, I took kind of a

23  typical history, and then the second time I administered a

24  psychological test to see what his current psychological

25  functioning was, and then I gave feedback.  I also met with

1    his father in terms of gathering family history.

2            THE COURT:  Could I get a little context here?

3        You say that Dr. Lewis met with him seven or eight times

4    in February and March of this year, correct?

5            THE WITNESS:  Yes.

6            THE COURT:  Of this year?

7            THE WITNESS:  Yes.

8            THE COURT:  What caused this treatment or meeting?

9            MR. LOWE:  I referred -- I'll make that clear.  I'm

10   sorry.

11           THE COURT:  Okay.

12   BY MR. LOWE:

13   Q.  How did Jordan Bell come to you in the first place?

14   A.  You referred to him for evaluations and independent

15   recommendations.

16   Q.  Okay.  After I made that referral, was I a part of the

17   treatment process or guiding you or telling you to do anything

18   or not do anything?

19   A.  No, you didn't.  You just asked for my opinion.

20   Q.  All right.  And you did eventually come up with an

21   opinion.  You have a report that you prepared in this case?

22   A.  I did.

23           MR. LOWE:  Okay.  May I approach, Judge?

24           THE COURT:  Yes, sir.

25   BY MR. LOWE:

8

1    Q.  I'm showing you what's been marked as Defendant's Number

2    2.  I previously tendered it and have shown it to the U.S.

3    Attorney in the case.

4        Is this an accurate representation?

5    A.  Yes.  It's an accurate representation.

6            MR. LOWE:  I'll offer 2.

7            THE COURT:  Any objection?

8            MS. FAHEY:  No objections, Your Honor.

9            THE COURT:  It's admitted.

10       Thank you, sir.

11           MR. LOWE:  Thank you, Judge.

12   BY MR. LOWE:

13   Q.  So the original test that you administered to Jordan Bell,

14   what test was that?

15   A.  It's called the Millon Multiaxial Clinical Inventory,

16   MCMI.

17   Q.  Can you describe for the judge what that test is?

18   A.  Yes.  This is a test measuring various personality

19   dimensions as well as to determine the degree that which a

20   client might fall within a normal range or outside of that

21   range.

22   Q.  And what are the different results that you can get on a

23   test like that that would be relevant to treatment?

24   A.  Well, one reason I wanted to give it, as always, I wanted

25   to see, number one, is his thoughts based in reality.  That

9

1    is, he's not schizophrenic or something like that.

2       Number two, I'm very interested in all kinds of court

3    cases to the degree in which sociopathy exists.

4    Q.  What is sociopathy?

5    A.  Sociopathy is those clusters of characteristics that

6    people tend to exploit others or behaviors --

7            THE COURT:  Tend to do what, sir?  I didn't

8    understand you.  Tend to do what?

9            THE WITNESS:  Exploit others for their own needs.

10      And one reason I'm very interested in this particular

11   dimension is -- you know, there is an old kind of wisdom that

12   sociopaths cannot be treated.  So I'm looking to see what

13   degree of sociopathy is there.  I personally think they can be

14   treated, but --

15   BY MR. LOWE:

16   Q.  Okay.  And did you see an indication of sociopathy

17   according to the Millon test?

18   A.  Sociopathy is very low.  It's in the zero to tenth

19   percentile.

20   Q.  Okay.  And then what conclusion did you draw from the

21   Millon test?

22   A.  Well, the conclusion I drew from that was, first of all,

23   he felt quite guilty for what he did.  Second place, that he

24   had the willingness and the strength to benefit from a

25   treatment program.  Also, that there is a degree that he wants

10

1    to be a responsible citizen.  He also owned up to the charges

2    right away.  He didn't try to deny.  So that gives us a degree

3    of reliability in terms of his being truthful.

4    Q.  What happened next after you administered the Millon test?

5    What was the next test you did?

6    A.  Well, I brought him into -- asked him if he would be

7    willing to begin treatment, and he said he would be.  So I

8    initiated treatment after about three sessions.

9    Q.  When you say three sessions, what does that mean?

10   A.  Three clinical sessions in which I assess him.

11   Q.  So that's you and Jordan Bell one-on-one together?

12   A.  Yes.

13   Q.  That's not a group session?

14   A.  No, it's not a group.

15   Q.  Okay.  And after those three evaluations or assessment

16   sessions with Jordan one-on-one, what did you do next with

17   Jordan Bell?

18   A.  I accepted him into treatment, individual treatment, in

19   order to further understand how he functioned and tried to

20   help guide him towards a more healthy way of behavior and in a

21   way towards growth.  I also have a background in

22   rehabilitation.  I'm very interested in helping people

23   rehabilitate themselves.

24   Q.  And throughout the time that you met with Jordan Bell, was

25   he cooperative with you?

1    A.  He was.

2    Q.  Did he show any indication of any impediment to being

3    treated later that you saw?

4    A.  He showed that he was willing to do whatever it was in

5    order to understand himself and to get this behind him.  Also,

6    I determined that whatever issues -- whatever requirements of

7    the treatment program or of the Court, that he would be

8    compliant with those conditions.

9    Q.  And the Court has certain conditions that Mr. Bell will

10   have to follow regardless of what his sentence will be.  One

11   of those conditions I expect will be that he has to

12   participate in a sex offender treatment program.  As I

13   understand from your testimony, you administer a program like

14   that.  Is that correct?

15   A.  I do.

16   Q.  Can you describe for the Court what that means, what that

17   entails?

18   A.  Yes.  That entails a number of things.  First of all,

19   modules address certain things.  For example, if he were to

20   deny the offense, there is a module for denial.  There is a

21   module aimed at trying to understand why did he do what he

22   did.

23       The other thing is -- the main goal, because he was 18,

24   was to help him develop in a healthy psycho sexual way.  He

25   had very little experience from a sexual point of view, and

1    the two experiences he did have, he was trying to determine

2    whether or not he may be gay or whether or not he was

3    straight.

4    Q.  And so those are things that you can work on in your

5    group?

6    A.  Or individually.

7    Q.  Or individually.

8       In his case, would he be in a group if he were supervised

9    by you, or would he be individually supervised?

10   A.  I would supervise him individually.  At one point I would

11   move him into a group.

12   Q.  And what are the other things that focus on -- whether it

13   be parole or probation or supervised release, what are the

14   other things that you do to ensure that those individuals in

15   your group therapy are compliant with the therapy?

16   A.  Well, one thing we send them out for polygraphs.

17   Q.  And what exactly does that mean?  Why do you do that?

18   A.  Well, to see if they are being honest in terms of what it

19   is we're trying to measure.  For example, if he's restricted

20   in terms of not accessing the internet, then we can send them

21   out for a polygraph.  Have you or have you not checked this

22   condition with your probation or parole?

23   Q.  Okay.

24   A.  Polygraphs -- there are other types of polygraphs.

25   Monitored polygraphs, for example, is having to do with any

13

1    kind of sexual activity, which he is currently engaged in, and

2    that is always aimed at age appropriate behavior.

3    Q.   What about maintenance polygraphs concerning access to

4    children?

5    A.   Maintenance polygraph is a polygraph aimed at all

6    conditions of probation and parole, and if part of that is

7    that you cannot be around children of a certain age, that is

8    considered a maintenance polygraph.

9    Q.   If somebody fails a maintenance polygraph or is unable to

10   complete your treatment program, what is your next step as the

11   head of that program?

12   A.   Well, first of all, I would talk with the probation or

13   parole officer, and then we would make a determination how

14   quick he would take the next maintenance polygraph.  Should he

15   fail another maintenance polygraph, then we might suggest a

16   period of jail time in order to get his attention.

17   Q.   And you're willing to do that, are you not?

18   A.   Oh, yes.

19   Q.   Okay.  In this case with regard to Jordan Bell, do you

20   have any opinion concerning whether he would be compliant or

21   successful in sex offender treatment?

22   A.   I think he would be compliant with all conditions of

23   treatment should he be granted probation or parole.

24   Q.   And is there any research or literature concerning the

25   recidivism rate concerning individuals who have completed the

14

1    program?

2    A.  There is quite a bit.  The number one is by Carl Hansen,

3    the Canadian psychiatrist who runs treatment programs.  What

4    we are finding out is that if a person completes a supervised

5    treatment program, the recidivism rate is very low.  It will

6    vary somewhere from four to seven or eight percent.

7    Q.  Okay.  And in your opinion, you believe that Jordan Bell

8    would be a candidate or somebody who could complete or would

9    complete a program like that?

10   A.  I do.

11              MR. LOWE:  I'll pass the witness.

12              MS. FAHEY:  I have no questions.

13              THE COURT:  You may step down, sir.

14              THE WITNESS:  Yes, sir.

15              MR. LOWE:  Can this witness be excused, Your Honor?

16              THE COURT:  Yes.  You're free to go as well, sir.

17              THE WITNESS:  Thank you.

18              MR. LOWE:  I'll call Stephen Bell.

19              THE COURT:  Before you do, the question I had that

20   was not answered is, why did you get him involved at the point

21   you did?  He had not yet been charged, but you must have

22   had some --

23              MR. LOWE:  I'm sorry.  I didn't make that clear.

24        There was a search warrant that was run in February, and

25   as soon as that happened, the Bell family came to hire me, and

15

1    the first thing I recommended was --

2            THE COURT:  Okay.

3            MR. LOWE:  So they were all very forthcoming about

4    what happened.  There was no --

5            THE COURT:  I just need to know --

6            MR. LOWE:  The sequence of events.

7            THE COURT:  The sequence, yes, sir.  Thank you.

8            MR. LOWE:  I'm sorry about that.

9        And, Judge, in lieu of Stephen Bell giving testimony,

10   would it be okay if he just narrated the statement that he's

11   prepared?

12           THE COURT:  Sure.

13       Good morning, sir.

14           MR. BELL:  Good morning.

15           THE COURT:  If you're going to read, that's fine, but

16   people tend to go too fast, and I'm slow of ear and she's slow

17   as well.

18           MR. BELL:  Yes, sir.  I am guilty of that when I

19   read.

20           THE COURT:  Okay.  All right.

21           MR. BELL:  I'll do my best effort to slow down.  I

22   actually planned on memorizing or reciting it to you.

23   However, I felt I was going to miss something.

24           THE COURT:  No, don't do that.  I'm happy to hear you

25   read it.  I know you gave it a lot of thought.

1        MR. BELL:  I did, Your Honor.  Thank you for allowing

2    me to do this, first off.

3       I'm Jordan's father, Stephen Bell.  I've been married to

4    my wife, Tricia, for 23 years.  We have three children

5    together.  Matthew, our oldest son, he's an IT manager at a

6    distribution company down in Mansfield right next door to

7    where we live.

8       Our daughter, Sierra, she'll graduate from UTA next month,

9    December 15.  She's completing a degree in linguistics, and

10   she's already enrolled herself into a graduate program to

11   follow that.

12       THE COURT:  And you know I got a letter from her,

13   right?

14       MR. BELL:  Yes, sir, I do.

15       THE COURT:  Okay.

16       MR. BELL:  And then, as you know, Jordan.

17       So for me, a son of a career military man, I've been in

18   the air force for the last 23 years.  I'm currently the

19   maintenance superintendent right out here at the 301st Fighter

20   Wing here in Fort Worth.  Tricia is an elementary school

21   teacher in Grand Prairie and a TCU alum.

22       Jordan was born while we were stationed at Hill Air Force

23   Base, Utah.  That was my first duty station when I entered

24   active duty.

25       Growing up Jordan was very well behaved, reserved, very

17

1    smart.  He's never had an issue at home or at school.

2    Typically, sat in advanced classes.  He's very respectful,

3    very loving with the family.  Never hesitates to help out.

4        Due to my job, he stepped up as the man of the house

5    during my deployments multiple times, never grumbled as I

6    missed birthdays, Thanksgiving, Christmas, first day of

7    school, last day of school, and, sadly, sometimes everything

8    in between.

9        As Jordan started high school, it was a little tough for

10   him as I know he was bullied about his skin, his hair, his

11   shoes, his clothes, you name it.  High school can be a very

12   unforgiving environment.

13       I had the bits and pieces and knew he was having issues,

14   but he suffered in silence as he never wanted to speak about

15   it.  He once had his tires slashed, his car spray painted, but

16   he still never complained.  He just kept moving forward.

17       He was looking forward to college as he believed that

18   would be an opportunity to get away from the games that we see

19   in high school these days.  I believed it to be true.  A new

20   college would be a boost to him.  So that's what we focused

21   on.  I saw the excitement grow in him as that day neared.

22       While we waited for that day to come, Jordan did develop a

23   love for music and a love for the piano and, I think, was a

24   life saver for him at the time.  It helped him gain some

25   confidence, raise his self esteem.  I was able to see a

1   positive change in him as he played at music festivals around

2   the metroplex and, ultimately, a couple of state competitions

3   down in Austin where he actually did win state for his age

4   group and category.

5       We've always had a good relationship, and we did many

6   things together, but I'll be honest with you that really deep

7   connection was missing.

8       In February when I first learned about everything, I put

9   Jordan in treatment with Dr. Lewis, and I think that was when

10  our relationship did change for the better.  I would leave

11  work early on Tuesdays, and we would embark on our four hour

12  round trip to make it from South Arlington up to North Dallas

13  off of I-75 up there to see Dr. Lewis.  It was an opportunity

14  for us to bond and discuss everything.

15      I connected with my son more in those three months than

16  ever before.  As much as it pains me to say, it was then that

17  I learned the uniform that I wore every day was intimidating

18  to my own family.  Jordan never wanted to disappoint me.  He

19  just didn't realize that he really couldn't.  Despite it all,

20  I'll always cherish those drives.

21      Jordan absolutely knows he did wrong and must face you in

22  court today, and my goal is not to stand up here and absolve

23  my son of any wrongdoing.  I just want you to know little more

24  about us as a family and how much we love and support Jordan,

25  and there is no way we are giving up on him.

1          He has accepted full responsibility.  He is very

2     remorseful for the stress that he's caused us, the entire

3     family, and he has a plan in place to move forward.

4          I would not be standing up here in front of you today if I

5     did not believe in my son and his future potential.  He will

6     accomplish great things, and I'm certain of it.

7          Jordan was enrolled in UTA's STEM program and was

8     scheduled to start last summer after he graduated.  I've

9     worked hard to ensure my children have access to college, and

10    Jordan has a degree that will be waiting for him when he comes

11    home.  I want you to know that Jordan will have access to a

12    stable environment with the resources to ensure his success,

13    and I believe it's a great investment.

14         In the end, you don't know me from Adam, and I struggled

15    on how to convey my words and commitment to you so that they

16    can be measured and actually mean something, and this is the

17    only way I know how.

18         I'm a Chief Master Sergeant in the United States Air

19    Force, a designation for only the top one percent of the

20    military.  There are only 49 fire squadrons left on active

21    duty in the guard and reserve today.  As a chief enlisted

22    manager for an aircraft maintenance squadron, I am one of 49.

23    I've achieved the pinnacle of a chief's career with two

24    things, the love and support of my family and executing my

25    work.

20

1        I've deployed nine times over my career leading 300 plus

2    of America's finest into combat, seven times since 9-11, five

3    times in combat.  I will likely be on the road again here soon

4    with all that's going on in the world, all while completely

5    eligible for retirement.

6             THE COURT:  Say again?

7             MR. BELL:  All while eligible for retirement.

8        I continue to do this out of my commitment.  So today I

9    commit my word to you that I will do everything in my power to

10   ensure Jordan's success in the future.  I, along with my

11   family, have sacrificed much in our lives, and I have asked

12   for little to nothing in return.

13       Today, Your Honor, I humbly ask for your help and beg you

14   to consider my son's plea bargain.  We believe in him and know

15   he will not disappoint.  Thank you for the opportunity.

16            THE COURT:  Where do you expect to be deployed next?

17            MR. BELL:  I highly anticipate -- they have already

18   kind of put the preliminary word out there to be ready to move

19   in 60 days to the Pacific Theatre.  So they've already told us

20   about 180 days.  That will put me back home in September.

21   I'll have about three months of down time and back out to the

22   Middle East on January 19.

23            THE COURT:  So Guam?

24            MR. BELL:  It's an undisclosed location at this

25   moment in time.

1          THE COURT:  Have you considered getting out so you

2    can be home?

3          MR. BELL:  So I did bounce that around.  If the

4    required -- I'll tell you what.  I've achieved a lot in my

5    life, but it means nothing without my family, and if I have to

6    retire and leave to support my family, I am totally prepared

7    to do that.

8          THE COURT:  If you left, how would you -- what sort

9    of job would you do?

10         MR. BELL:  So based on my background right now, I'm

11    really hot for something like defense contract management

12    agency, something at Lockheed Martin.  Due to my years of

13    aerospace experience out there, I could pretty much walk out

14    of my job and into something like that relatively easy, and

15    for me it's literally walking across the runway, and I've have

16    had several people that have retired and done that.

17         THE COURT:  Your benefits are all vested, aren't

18    they?

19         MR. BELL:  Yes, sir.  I used tuition assistance to

20    achieve both my bachelor's and my master's, and the GI Bill to

21    put my wife through school and for the children the remaining

22    of the post 9/11 GI Bill.

23         THE COURT:  I'm sure everyone in the courtroom is

24    grateful for your service to the nation, but I'm guessing you

25    could actually get a pay increase by leaving the military?

22

1          MR. BELL:  Yes, sir, I could.

2          THE COURT:  How long are you going to be gone over

3     the next two deployments?

4          MR. BELL:  So if we do leave town end of February

5     time frame, it will be for 180 days, close to September.  Then

6     I'll be home probably that last quarter of '18, and then I'll

7     be out for six more months in January of '19.  So out of the

8     next 18 months, I'll have the potential to be gone for

9     awhile.

10         THE COURT:  All right.  Thank you, sir.

11         MR. BELL:  Thank you.

12         THE COURT:  I need to hear from Dr. Lewis again.

13         MR. LOWE:  Okay.

14         THE COURT:  Do you mind just standing there at the

15    lectern?

16         MR. LEWIS:  That's fine.

17         THE COURT:  I have some questions for you.

18       Did you hear the testimony offered by Mr. Bell's father?

19         MR. LEWIS:  Yes, I did.

20         THE COURT:  How important do you think his role would

21    be over the next year if he were not deployed?

22         MR. LEWIS:  I think it would be very important.  I do

23    believe Mr. Bell will take whatever steps he thinks is best

24    for his son if he were to be released to probation or

25    parole.

1          THE COURT:  Okay.  Thank you.

2          MR. LEWIS:  Thank you, sir.

3          THE COURT:  Mr. Bell, the -- do you mind standing so

4    I can hear you, not out of attention but just to hear you?

5        The plea agreement is for 48 months.

6          MR. BELL:  Yes, sir.

7          THE COURT:  Will you be able to complete your service

8    after -- within those 48 months?

9          MR. BELL:  Yes, sir.  I'm, actually, currently on a

10   four-year enlistment.  However, due to the number of years I

11   have in the service, I can submit retirement paperwork at any

12   time and walk away in six months.

13         THE COURT:  Okay.  Thank you.

14         MR. BELL:  Thank you.

15         MR. LOWE:  Your Honor, Jordan Bell would like to give

16   an allocution.

17         THE COURT:  Well, let's -- I may have to hear from

18   him again, but it would be appropriate because right now I'm

19   trying to decide whether to accept the plea agreement.

20         MR. LOWE:  All I have left is just an argument.

21   That's it.  So if you would like hear that, then I'll make it.

22         THE COURT:  Let's hear from him, and then I would

23   like to hear you summarize.

24         MR. LOWE:  Okay.  Thank you.

25         THE COURT:  Mr. Bell, right now before me is a

24

1    decision as to whether to accept the plea agreement.  As I've

2    explained to your attorneys, this plea agreement brings your

3    sentence down from a guideline range of 135 months to 48

4    months, which is a huge departure downward, and given your

5    behavior, I'm reluctant to approve that plea agreement.  So I

6    need to hear from you as to why you think I should.

7        This is not the time to plead so much for mercy in the

8    sense of a final decision having been made.  I'm trying to

9    decide whether to accept the plea agreement.  So if you can

10   focus on that -- I know you're a young fellow, but you're also

11   very bright.  I suspect you can handle that assignment.  Tell

12   me why you think I should accept this plea agreement.

13            DEFENDANT BELL:  Yes, sir.

14            THE COURT:  Go ahead.

15            DEFENDANT BELL:  First off, while I have everyone's

16   attention, I just want to start off with an apology to my

17   family for supporting me and getting me through this process.

18   And then I -- this offense started taking place around when I

19   was about 15 or 16.  That's when I started getting involved

20   with stuff related to my charge and -- I'm sorry.

21       When I was about 15 or 16 years old, I was often bullied

22   and made fun of for my sexuality or questioning my sexuality,

23   and that led me to seek refuge in myself and I got to very

24   dark places, and I started viewing pornography, and little did

25   I know that that would be one of the biggest mistakes in my

25

1    life because it would further lead to major consequences down

2    the line.

3        I'm sorry.  I'm struggling.

4            THE COURT:  It's all right.  You're doing okay.

5        You know one of the things that really has bothered me the

6    most about this is the fact that you -- to put it in street

7    terms, you pimped out your sister.  You photographed her in a

8    private situation and used the photographs to trade for

9    pornography.

10           DEFENDANT BELL:  Yes, sir.

11           THE COURT:  And that really bothers me as a judge and

12   as a person because that shows a willingness to do things that

13   are pretty gross and uncaring about someone that you should

14   love.

15       Do you have any thoughts about that?  Anything you want to

16   say to me about that?

17           DEFENDANT BELL:  Yes, sir.

18       Even though my sister can't be here today, I still want to

19   make an apology to her.

20           THE COURT:  I don't know why, but she's forgiven you,

21   apparently.  I mean, she said in a letter to me that she's

22   forgiven you.  That's pretty amazing.  A lot of sisters

23   wouldn't do that.

24           DEFENDANT BELL:  Ever since I was little, my sister

25   and I have had a very strong bond.  However, when I was in my

1   dark place, which is, obviously, no excuse for my behavior, at

2   the time I felt as though I -- I don't want to say invincible,

3   but I just felt like I wasn't hurting anyone at the time.  But

4   seeing all this come down and I come back to, like, reality, I

5   see how much it hurt my sister and my family and everyone

6   involved.

7       I fully expected my sister not to forgive me for all this,

8   but I do thank her, and I often visit with her at the jail

9   that I'm held at.  We still talk like normal.  It's like -- I

10  feel as though we have a really strong bond that can't be

11  broken and I love my sister very much, and I do deeply regret

12  what I did to her.

13      I do want to change.  I want to make a substantive change,

14  participating in that group session with Dr. Lewis.  Those few

15  sessions that we've had, I felt a lot more comfortable and a

16  lot more open about what I was feeling, and the desire or the

17  feeling of needing to lash out like that out of character

18  slowly started to go away in that time.

19      When I am eventually released, whenever that may be, I do

20  want to continue the treatment that I was on prior to this,

21  and I want to change myself for the better, receive my

22  education, and go on to be a productive member of society.

23          THE COURT:  All right.  Thank you.

24      You may have a seat, please.

25      Mr. Lowe.

1          MR. LOWE:  Judge, the 48 months that we agreed to we

2     felt like that was the right sentence for this particular

3     case.  The guidelines are problematic because there is no

4     guideline provision to deal with relevant conduct that

5     occurred primarily when a defendant was a juvenile.  There is

6     only juvenile references in the guidelines criminal history

7     category but not to relevant conduct.

8          So the relevant conduct is through the roof in this case

9     as it should be.  I have made no objection and we've not said

10     that Jordan Bell didn't do these things, but I do think that,

11     since we are talking about a 15-year-old who began down a very

12     dark path that culminated into something that he continued to

13     do all the way until he was 18 when he was finally caught.

14          Judge, if we look at just the timeline itself, the

15     initiation of the investigation occurred the same month that

16     Jordan Bell turned 18, and three months later the federal

17     authorities are in his home seizing his computer.  So he's 18

18     years and three months.  If that had taken place just a few

19     months earlier, then this would be a juvenile case, not an

20     adult case.

21          It doesn't change the character of the case.  It's still

22     an adult case, but the relevant conduct -- I think it would be

23     a mistake in this case to employ a deterministic, formalistic

24     application of the federal sentencing guidelines.  I think

25     that would be a mistake, because there is no guideline to

1    anticipate this particular type of situation.  So I do think a

2    four year sentence is appropriate in this case.

3        I also think the family support for Mr. Bell is

4    overwhelmingly strong.  I do not believe you will ever see

5    Mr. Bell again should he be on supervised release.  The Court

6    should also know -- knows that Mr. Bell can be on supervised

7    release for the remainder of his lifetime if the Court chooses

8    to do that.  The Court could do that.

9        The type of supervision that Mr. Bell would be under would

10   be very extensive.  He would be subject to polygraphs, weekly

11   meetings, restrictions on his computer access.  There would be

12   a great deal of control and supervision over Mr. Bell, and I

13   think for such a young man with such great potential, less

14   penitentiary time and more rehabilitation time would be more a

15   appropriate sentence in this case considering the 3553

16   factors.

17       So I don't believe that the federal sentencing guidelines

18   pose any kind of impediment to accepting this sentence, Judge.

19   I believe if we consider the 3553 factors and how the

20   guidelines really don't address this type of case, that it is

21   appropriate to sentence Mr. Bell to four years in this case,

22   and so that's why we've agreed to this sentence, and I would

23   ask you to please accept that sentence.

24            THE COURT:  All right.  Let's take a little time out.

25   I won't call it a recess because I want you all to stay where

                                                                      29

1    you are.

2         (Brief pause in proceedings)

3              THE COURT:  I need to see Mr. Bell.

4         (Brief pause in proceedings)

5              THE COURT:  May I see counsel?

6         (Brief pause in proceedings)

7              THE COURT:  Let me ask you, Ms. Fahey.  You mentioned

8    at the bench something about -- and I vaguely remember --

9    something about encrypted material that you haven't been able

10   to access.

11             MS. FAHEY:  Yes, Your Honor.  I believe it's

12   somewhere in the PSR.  There was an encrypted hard drive, and

13   we don't know what's on it.  We were never able to get into

14   that.  The concern was everything that we have here that is

15   causing such a great deal of concern was what he did not

16   encrypt.  So we don't know what he's hiding.

17             THE COURT:  Mr. Lowe, can you tell me whether you're

18   able to help probation officers at some point to get to that

19   encrypted material, because it might be helpful to them in

20   deciding treatment options down the line?

21             MR. LOWE:  I mean, to the extent that it doesn't lead

22   to additional charges.

23             THE COURT:  Right.  No, I'm talking about --

24             MR. LOWE:  Just so they know what they are dealing

25   with?

30

1          THE COURT:  Just so they know what they are dealing

2     with.

3          MR. LOWE:  I could ask my client if he knows of a

4     password or some way to decrypt it.

5          THE COURT:  Can you ask him now?

6          MR. LOWE:  Sure.

7       (Brief pause in proceedings)

8          MR. LOWE:  Mr. Bell told me that -- he said that he

9     told the agents the password for the encrypted hard drive at

10    the time.  I guess, for whatever reason, that wasn't used.  He

11    said that there were probably three or four passwords that he

12    was using, and he said that he would assist probation and

13    supply them all the passwords he was using so that they could

14    decrypt the hard drive and gain access to the hard drive.

15      I asked him at this point does he know the specific

16    password, and he said he doesn't know the specific one, but he

17    said he had like kind of a staple of three or four passwords

18    that he was using.  So he could use all those to try to

19    decrypt it.

20         THE COURT:  Can you tell us there would be no

21    additional charges that would flow out of that?  I want the

22    probation officer to know everything he needs to know --

23         MS. FAHEY:  Okay.

24         THE COURT:  -- to deal with the situation, but I

25    don't want that to end up -- I can't make him give it up if

1    it's going to put him in jeopardy.

2            MS. FAHEY:  I'm not sure if I, actually, have any

3    authority for non-prosecution.  The main concern would be -- I

4    guess the fear has always been that the defendant actually

5    engaged in the production of child pornography and we have

6    victims that we now have to notify and can now identify, and

7    that's the concern there without knowing what's on there.

8            THE COURT:  Okay.  It's probably beyond our ability

9    to deal with right now.

10       (Brief pause in proceedings)

11           THE COURT:  Did you receive the terms of supervised

12   release?

13           MR. LOWE:  Yes, Your Honor, and I've shown them to

14   Mr. Bell, and he signed them.

15           THE COURT:  Okay.  Could I see those?

16       (Brief pause in proceedings)

17           THE COURT:  All right.  Mr. Bell, you may return to

18   the lectern.

19       I have reviewed the plea agreement and the charge to which

20   Mr. Bell has pled guilty, and I have determined that that

21   charge adequately reflects the seriousness of the defendant's

22   actual offense behavior, so that accepting the plea agreement

23   will not undermine the statutory purposes of sentencing, all

24   relevant conduct having been taken into consideration in the

25   calculation of the total offense level.  Therefore, the plea

1    agreement is accepted.

2         Mr. Lowe, did you and your client receive in a timely

3    manner a copy of the presentence report in this case?

4              MR. LOWE:  Yes, Your Honor.

5              THE COURT:  Did you have an opportunity to review it

6    carefully with Mr. Bell?

7              MR. LOWE:  I did, Your Honor.

8              THE COURT:  Did the government receive it timely?

9              MS. FAHEY:  Yes, Your Honor.

10             THE COURT:  There being no objections to the fact

11   findings in the presentence report, I adopt those findings as

12   my own.

13        There being no objections to the probation officer's

14   conclusions set forth in the report as to the appropriate

15   guideline calculations, I adopt those conclusions and

16   determine that the appropriate guideline calculations are:

17        Total Offense Level 33.  Criminal History Category I.

18   Imprisonment range 135 to 168 months.  Supervised release

19   range five years to life.  A fine range of $35,000 to

20   $250,000, plus, the costs of imprisonment and supervision.

21        Before I pronounce the sentence, Mr. Bell, do you wish to

22   make any remarks on behalf -- pardon me.  Mr. Lowe, do you

23   wish to make any remarks on behalf of Mr. Bell?

24             MR. LOWE:  No additional remarks.

25             THE COURT:  Now, Mr. Bell, this is the time to make

1   any additional remarks to the Court or present any information

2   in mitigation of your sentence?

3          DEFENDANT BELL:  I would not like to.

4          THE COURT:  Sir?

5          DEFENDANT BELL:  I would not like to.

6          THE COURT:  You have said all you want to say?

7          DEFENDANT BELL:  Yes, sir.

8          THE COURT:  Where have you been incarcerated?

9          DEFENDANT BELL:  Fort Worth Jail Unit.

10         THE COURT:  Okay.  Have you been mistreated while you

11  were there?

12         DEFENDANT BELL:  Yes.  When I got there, I was

13  sexually harassed, and that's been ongoing for about six or

14  seven months since I've been there.

15         THE COURT:  Well, be more explicit.  What does

16  sexually harassed mean?

17         DEFENDANT BELL:  Such as when I'm in the shower,

18  people stand outside taunting me and making sexual moans and

19  threatening to take a shower, but I have not made any formal

20  reports for fear of retaliation.

21         THE COURT:  Do you have any friends or made any

22  friends?

23         DEFENDANT BELL:  Yes, sir.  There are about three or

24  four inmates with similar charges, and we try to look out for

25  each other.

34

1          THE COURT:  But people there know what you're charged

2    with?

3          DEFENDANT BELL:  Yes, sir.

4          THE COURT:  How did they find that out?

5          DEFENDANT BELL:  I believe they can call someone on

6    the outside and search my name and find out what I'm charged

7    with.

8          THE COURT:  Okay.  I'm sure that's true.

9        Ms. Fahey, do you wish to speak on behalf of the

10   government?

11         MS. FAHEY:  No, Your Honor.

12         THE COURT:  Then I'll now state the sentence,

13   determined after consideration of all the factors set out in

14   Title 18, United States Code, Section 3553(a), including,

15   especially, the advisory sentencing guidelines issued by the

16   sentencing commission and the conduct admitted by Mr. Bell in

17   his factual resume.

18      The attorneys will have a final chance to make legal

19   objections before sentence is finally imposed.

20      I've got one problem I've got to resolve.  I've got to fix

21   something.  Excuse me just a moment.

22      (Brief pause in proceedings)

23         THE COURT:  It is the judgment of the Court that the

24   defendant, Jordan Lee Bell, in Case Number 4:17-CR-058-Y, be

25   committed to the custody of the Federal Bureau of Prisons for

1    a period of time served.

2         Do you understand what that means?

3              DEFENDANT BELL:  Yes, sir, I do.

4              THE COURT:  Okay.  Restitution is not ordered because

5    none of the victims have requested restitution.  The Court

6    does not order a fine or costs of incarceration because

7    Mr. Bell does not have the financial resources or future

8    earning capacity to pay a fine or costs of incarceration.

9         Mr. Bell shall pay an assessment pursuant to 18, United

10   States Code, Section 3014, to the United States in the amount

11   of $5,000, payable to the U.S. District Clerk, and if upon

12   commencement of the term of supervised release -- would you

13   hand that to Mr. Lowe -- any part of the assessment imposed

14   pursuant to -- it's the same thing you signed before --

15   pursuant to 18, United States Code, Section 3014, remains

16   unpaid, Mr. Bell shall make payments on the unpaid balance at

17   the rate of at least $60 -- pardon me -- unpaid balance 60

18   days after release from custody at the rate of at least $100

19   per month until the fine is paid in full.  No assessment shall

20   be payable during incarceration from funds deposited into

21   Mr. Bell's inmate trust account -- actually, there won't be

22   any of that.  I'll delete that.

23        Pursuant to 18, United States Code, Section 2253, and

24   Federal Rules of Criminal Procedure -- Federal Rule of

25   Criminal Procedure 32.2(b)(4)(B), it is, hereby, ordered that

1    Mr. Bell's interest in the following property be condemned and

2    forfeited to the United States:

3        One Kingwin desktop computer bearing Serial Number

4    006216209707, an Apple iPad, Serial Number DMTGL72CDFHW, an

5    Apple iPhone, Serial Number IMEI:358371067472483, and a

6    SanDisk Ultra Flair 64GB flash drive.

7        It's further ordered that upon release from imprisonment,

8    Mr. Bell shall be on supervised release for a term of life, or

9    until such time as a judge of this Court shall order his

10   discharge from supervision or modify its duration.

11       While on supervised release, he shall comply with the

12   standard conditions recommended by the sentencing commission

13   and comply with certain additional conditions that have been

14   set out in a separate order signed by me this day and offered

15   to Mr. Bell for his review and signature.  He has now returned

16   that order to me with his signature indicating his receipt of

17   the additional terms, his understanding of them, and his

18   waiver of having them read here in open court.  He's also

19   ordered to pay a mandatory special assessment of $100.

20       A sentence of time served is sufficient but not greater

21   than necessary to comply with the purposes set forth in

22   Paragraph 2 of Section 3553(a), that is, reflect the

23   seriousness of and provide just punishment for the offense,

24   promote respect for the law, afford adequate deterrence to

25   criminal conduct, and protect the public from further crimes

37

1    of the defendant.

2        This is a downward departure based upon the Court's

3    concern as to the defendant's age, virtually a minor, and his

4    vulnerability in prison, and if this sentence is insufficient

5    or, otherwise, objectionable on appeal as a downward

6    departure, I order the same sentence as a -- what am I trying

7    to say -- as an outside the guideline sentence, as a variance,

8    for the same reasons, and for the reasons enunciated by

9    Dr. Lewis and counsel for the defendant.

10       I've now stated the sentence and the reasons therefore.  I

11   call upon the parties to indicate any legal reason why

12   sentence may not be imposed as stated?

13            MS. FAHEY:  No objection, Your Honor.

14            MR. LOWE:  No objection.

15            THE COURT:  Sentence is then imposed as stated.

16       Mr. Bell, you have waived your right to appeal your

17   sentence and to complain of it in a collateral proceeding.

18   However, you have reserved from that waiver the right to

19   complain of any errors in arithmetic that I may have made in

20   the calculation of your total offense level or your criminal

21   history category.  Also, the right to challenge the

22   voluntariness of your plea of guilty and your waiver of

23   appellate rights, and the right to complain of any ineffective

24   assistance of counsel.  If you decide to appeal on any ground,

25   you do have the right to apply for leave to appeal in forma

38

1    pauperis.

2        You have returned to me this morning a notice of right to

3    appeal sentence -- Carmen, notice of right to appeal sentence.

4        (Brief pause in proceedings)

5            THE COURT: Please understand that this is your

6    notice -- notice to you that you have the right to appeal.  It

7    is not your notice to the Court that you are, in fact,

8    appealing, and if you decide to appeal, you must do so within

9    14 days in writing filed with the Court, and Mr. Lowe will

10   assist you in that if you ask him to.

11       Okay?

12           DEFENDANT BELL:  Yes, sir.

13           THE COURT:  Do you understand what's happened here

14   today?

15           DEFENDANT BELL:  Yes, sir, I do.

16           THE COURT:  I want you to know I don't want to see

17   any violations.

18           DEFENDANT BELL:  Yes, sir.

19           THE COURT:  I've given you the biggest break I've

20   ever given in the 26 years I've been on this bench.  I did it

21   because you're vulnerable and you're young, but I'm not going

22   to have any tolerance of any violations of your terms of

23   supervised release, especially as it relates to pornography or

24   any predatory behavior on your part.

25           DEFENDANT BELL:  Yes, sir.

39

1      THE COURT:  You're going to have to get right.  If

2  you decide you're gay, okay, I'm not saying that.  I am saying

3  you can't be a predator.  You can't be involved with

4  pornography.  You can't do any of those things that you viewed

5  that you've done in response to what you believe how you've

6  been treated.

7      DEFENDANT BELL:  Yes, sir.

8      THE COURT:  And I'm going to have a probation officer

9  riding you pretty tight, and when he says jump, you're going

10  to have to say, how high.

11      DEFENDANT BELL:  Yes, sir.

12      THE COURT:  I also told your father I want him to

13  leave the military, and I want him to do it right away.  I

14  don't have the power to order him to do that as a part of

15  this, but I can order -- I can be aware of it.  I think he is

16  an important part to your recovery and getting around that.

17  So he's agreed to do that.  All right?

18      DEFENDANT BELL:  Yes, sir.

19      THE COURT:  Any questions?

20      DEFENDANT BELL:  No, sir.

21      THE COURT:  All right.  Good luck to you.

22      DEFENDANT BELL:  Thank you very much.

23      MR. LOWE:  Thank you, Your Honor.

24      THE COURT:  Ms. Fahey, you did your job.

25      MS. FAHEY:  Thank you.

40

1        (End of proceedings, 11:20 a.m.)

2                           -oOo-

3

4                    I N D E X

5    Witnesses:          Direct    Cross    Redirect    Recross

6    Dr. Franklin Lewis       4

7

8                           -oOo-

9

10                  E X H I B I T S

11   Exhibit Number                 Offered        Admitted

12   Defendant's 1                      5              5

13   Defendant's 2                      8              8

14

15                           -oOo-

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter, and
22   that the transcript was prepared by me and under my
     supervision.

23

24   s/  Ana P. Warren                      December 4, 2017
     Ana P. Warren, CSR #2302                    Date
25   U.S. District Court Reporter

                    U.S. DISTRICT COURT